UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

UBS AG                                          CASE NO.: 00-3061-CIV-HUCK
                                                MAGISTRATE JUDGE BROWN

        Plaintiff,

vs.

ENRIQUE CLEMENTE BENET,

        Defendant.

_____/

### Defendant Benet's Memorandum in Support of His
### Motion to Dissolve Prejudgment Writs of Garnishment and For Attorney's Fees

        Defendant, Enrique Clemente Benet files this Memorandum in Support of his Motion to Dissolve

the Prejudgment Writ of Garnishment obtained by plaintiff, UBS AG, and for attorney's fees and states

as follows:

### Introduction

        The plaintiff, UBS AG ("UBS"), formerly known as the Union Bank of Switzerland, is arguably

the largest bank in the world.  Defendant Enrique Clemente Benet ("Benet") is a 76 year old, 30 year

resident of Coral Gables, Florida.  Before serving Benet with its complaint, UBS improperly lead this

Court into issuing several prejudgment writs of garnishment which have resulted in the "freezing" of in

excess of $1,500,000 of Benet's moneys.   UBS' motion to issue the "Prejudgment Writs" was based

upon its *ex parte* affidavit and its contention that it is entitled to recover over $1,800,000 from Benet in

liquidated damages. Now, however, the burden is on UBS to prove the grounds for obtaining the

Prejudgment Writs, including but not limited to establishing that its claims are liquidated and not

contingent, and demonstrating that it is likely to prevail on the merits of its claims. As demonstrated below,

UBS cannot sustain its burden.   Benet emphatically denies that he owes UBS any money and more



importantly there is no reasonable basis for UBS to claim that its damages are liquidated and not contingent. This is simply not a case where prejudgment garnishment is appropriate. Because UBS cannot meet the burden imposed upon it, pursuant to the law invoked by UBS to obtain its extraordinary prejudgment relief, Benet moves for an award of all attorneys fees and damages incurred as a result of UBS having improperly caused this Court to issue the Prejudgment Writs.

## I.    **Factual Background**

Benet, who was born in 1924 in the Catalonia Region of Spain[1], is an American Citizen who has lived in Coral Gables, Florida for approximately thirty (30) years. Mr. Ricardo Acero Repolles ("Acero"), who is deceased, was also a Spaniard from Catalonia, was born in 1920 and resided in Barcelona when he became acquainted with Mr. Benet in 1971. Contemporaries of common origin and with much in common Benet, Acero and their wives became very close friends. The four of them spent quite a bit of time traveling together and in Miami and Barcelona, where Benet's parents lived.

In 1987 Benet's wife died after a long illness. During this difficult time, Mr. and Mrs. Acero traveled several times to Miami to lend support to Benet. In October of 1987, Acero was diagnosed as having a terminal illness. At that point Acero began to make testamentary provisions in favor of his wife. In January of 1988, Mrs. Acero was tragically killed in an automobile accident in Barcelona. Following the death of his wife, Acero and Benet became even closer friends. They would talk daily on the telephone and in mid April, 1988, Acero came to Miami to stay with Benet and his family for several months. By all accounts, during this difficult period, Benet was always there in support of his friend.

Before joining Benet in Florida, Acero settled his affairs in Spain. On April 6, 1988, Acero prepared a last will and testament, appointing various inheritors and legatees and leaving the minimum

---

[1]  Catalonia is a region in Northeast Spain with its own distinct dialect and customs.

allowable under Spanish law to his estranged daughter from an earlier marriage. The undisputed testimony of Benet and several other witnesses who were close to Acero and testified during related Swiss legal proceedings, was that Acero never spoke of his estranged daughter to anyone and that neither Benet nor several of Acero's close friends even knew that he had a daughter. Acero's will was drawn up to address only his estate on Spanish territory. It did not mention or address his assets located in Switzerland and in the United States. After the preparation of his will Acero took other steps with respects to his assets in the United States and Switzerland.

Specifically, Acero came to the United States and opened fourteen (14) new accounts in his own name, but for the benefit of Benet. These accounts were opened in fourteen (14) different banks, they were each for $100,000.00 and totaled $1,400,000.00, and they were opened in the name of Ricardo Acero Repolles i/t/f Enrique Benet. These accounts are commonly referred as "Totten Trust" accounts. Upon the death of the owner of a Totten Trust account, title to the account (and hence to the monies) transfers automatically to the beneficiary designated on the account: "It is well settled that absent a settlor's revocation or disaffirmance, 'the presumption arises that an absolute trust was created as to the balance on hand at the death of the depositor.'" Lopez v. Rodriguez, 574 So.2d 249 (Fla. 3d DCA 1991)(quoting Seymour v. Seymour, 85 So.2d 726, 727 (Fla.1956) (emphasis deleted) (quoting In re Totten, 179 N.Y. 112, 71 N.E. 748, 752 (N.Y.1904)). Acero, apparently aware of troubles in the U.S. banking system in the late 1980's, opened these i/t/f accounts in Florida so as to ensure that each account would be fully FDIC insured. It is significant and worthy of repeating that these accounts were opened after Acero had prepared the Spanish will, which is dated April 6, 1988. Again, the undisputed testimony given by several of Acero's close friends in Swiss legal proceedings, is that Acero set up these Totten Trust in favor of Benet with the conscious understanding and intent that by doing so he would ensure that his assets in the United States would be transferred to Benet upon his death.

At the end of August in 1988, Acero traveled to Geneva, Switzerland. The purpose of the trip was for Acero to address his financial affairs in Geneva, as he had already done in Florida. Once again, the testimony of Benet and Acero's close friends and of Swiss bankers given during the Swiss proceedings unequivocally establishes that Acero went to Switzerland in order to take the necessary steps with Swiss banks (where he had substantial deposits) to ensure that his Swiss assets would be transferred to Benet upon his death. Specifically, Acero went to visit UBS and Cook & Cie, now known as Bank Marcuard Cook & Cie ("Cook & Cie"). Mr. Acero had approximately the equivalent of $1,385,000.00 in U.S. Dollars deposited in UBS and approximately the equivalent of $625,000.00 in U.S. Dollars deposited in Cook & Cie. The evidence developed in the Swiss proceedings is undisputed that Acero had instructed the Swiss bankers to take the appropriate steps to ensure that his assets would be transferred to Benet upon his death. Swiss banking law, however, apparently did not contain a provision, like the Totten Trust accounts available in the United States, that allowed monies to be automatically transferred to a named beneficiary upon the death of the account holder. Unfortunately for Benet, UBS did not explain this to Acero. Instead, UBS advised Acero that his intent could be accomplished through the simple act of filling out a power of attorney with Benet as beneficiary. Acero listened to his banker's advice and signed an unfinished power of attorney leaving instructions as to Mr. Benet's identity.

Acero passed away during May, 1989. In accordance with his wishes and instructions, Benet obtained the monies left in the Florida Totten trust accounts. Also in accordance with Acero's wishes and instructions, Benet traveled to Switzerland where he completed the power of attorney that Acero had left for him at UBS. Over a period of several months Benet took possession of the assets in the Swiss banks that his friend had left for him. Benet's troubles began shortly thereafter. As a direct result of UBS's failure to either adequately created a mechanism to carry out Acero's wishes that his assets be transferred

4

to Benet upon his death or to properly advise Acero that such an automatic transfer could not be achieved under Swiss law, Benet has been subjected to more than ten years of litigation.

As previously mentioned, Acero had prepared a will in his native Spain. The will left all of Acero's Spanish assets to a charity with the exception of the amounts required under the Spanish "forced share" statutes that he left to his estranged daughter.  Consistent with his intent to leave the Florida and Swiss assets to Benet, no mention was made of these assets in the Spanish will.  When the executor of Acero's Estate in Spain later learned of the Swiss accounts, civil and criminal actions were filed against Benet in Switzerland. The criminal action was dropped by the prosecutor because there was no proof that Mr. Benet committed any criminal act.  UBS was joined in the civil action.  Again, no doubt because the law regarding Totten Trust accounts clearly allows for Acero to do exactly what he intended to do, no action was ever brought by the Estate with respect to the Florida Totten Trust accounts.

Throughout the ten years that it took for the Swiss proceedings to reach their conclusion, UBS, obviously recognizing its central role in causing Benet's troubles, did not file any claims against Benet and took no action of any type against Benet.  Until now that is.

The Swiss litigation ended earlier this year with the Swiss Federal Court affirming a judgment in favor of the Estate of Acero and against Benet and UBS.  The judgment in effect determined that the Power of Attorney executed by Acero in favor of Benet that UBS had set up as the mechanism for Acero to transfer his assets to Benet was inadequate for that purpose.  Therefore, UBS had improperly allowed Benet to take monies out of Acero's accounts that belonged to Acero's estate.  The judgment also found Benet culpable for taking the very money that everyone agrees Acero wanted him to have after his death. UBS paid the judgment and now brings this action to recover from Benet.  As between Benet and UBS, however, the culpable party is clearly UBS for its failure to carry out its client's wishes or failing to properly advise its client.  Benet did nothing more than carry out the wishes of his friend.  The testimony

of the Swiss bankers from UBS and Cook & Cie as to why they allowed Benet to take possession of the assets in Acero's accounts is particularly revealing on this point. They testified that:

- the post-mortem arrangements made by the banks were explained to Acero who clearly understood that Benet would be the beneficiary of all of the assets in his accounts.

- they had no doubt that because of the arrangements made by Acero and the banks that Benet had complete powers over Acero's assets after Acero's death.

Mr. Neville Cook of Cook & Cie, who had known Acero for more than 15 years, offered as additional justification that "**Mr. Acero told me several times that he wanted his assets outside Spain transferred to Mr. Benet after his death.**"

Notwithstanding these facts, before serving Benet with its Complaint, UBS caused this Court to issue on an *ex parte* basis several prejudgment writs of garnishment, which has resulted in the "freezing" of in excess of $1,500,000.00 of Benet's monies. As will be shown below this is an abuse of our legal system by a foreign bank, arguably the largest bank in the world, in an effort to deliver a crippling blow to Benet and gain leverage where it otherwise has none. UBS, among other things, simply cannot in good faith claim that its damages are liquidated or that they are not contingent. For that and other reasons articulated below, Benet respectfully requests that this Court dissolve the Prejudgment Writs and award Benet his attorneys' fees and costs associated with dissolving the writs and any other sanctions that this Court deems just and proper.

## II.     Standard on Motion to Dissolve Prejudgment Writs of Garnishment

Chapter 77 of the Florida Statutes governs the issuance of writs of garnishment, including the Prejudgment Writs obtained by UBS in this case. Because garnishment is a statutory procedure, "the statutory scheme must be strictly adhered to." Farm Credit of N. Fla., ACA v. Double H Dairy, Inc., 742 So.2d 436 (Fla. 1st DCA 1999). Where a prejudgment writ is issued, the defendant has a right to an

immediate hearing for dissolution of the writ. Fla. Stat. § 77.07 (1999); see Fla. Sta. § 77.031 (1999).

Section 77.07 in turn:

> [R]equires the trial court to dissolve a writ of garnishment '**unless the petitioner proves the grounds upon which the writ was issued** and **unless,** in the case of a prejudgment writ, **there is a reasonable probability that the final judgment in the underlying action will be rendered in his or her favor**.

Doug Sears Consulting, Inc. v. ATS Svcs., Inc., 752 So.2d 668, 669-70 (Fla. 1st DCA 1999) (emphasis added, quoting § 77.07) accord Hurricane Towing, Inc. v. Petro Hydro, Inc., 2000 WL 1276754 (S.D. Fla. May 19, 2000) (Jordan, J.)("At a hearing to dissolve a prejudgment writ, **the burden is on the plaintiff to prove the grounds for the issuance of the writ**.")(emphasis added);Marshall-Shaw v. Ford, 755 So.2d 162, 164 (Fla. 4th DCA 2000)("When a party moves to dissolve a writ of attachment or garnishment, the party opposing the motion must prove the grounds on which the writ issued and a reasonable probability of obtaining a final judgment in his or her favor."); Matthews v. Wood, 485 So.2d 472 (Fla. 2d DCA 1986)(affirming order dissolving writ of garnishment and rejecting argument that plaintiff could simply rely on prima facie case to avoid dissolution of writ). Here, UBS cannot sustain its burden.

### III.   Prejudgment Garnishment is Not Available for Contingent or Unliquidated Claims

The Florida garnishment statutes provide directly that: "Before judgment against a defendant no writ of garnishment shall issue in any action sounding in tort." Fla. Stat. § 77.02 (1999). This rule also applies to claims that sound in tort even if the claim arises out of a contractual relationship. Thompson v. Commercial Union Ins. Co., 267 So.2d 18 (Fla. 1st DCA 1972). Further, a prejudgment writ of garnishment will not lie for unliquidated debts. Ake v. Chancey, 152 Fla. 677, 13 So.2d 6 (1943); Papadakos v. Spooner, 186 So.2d 786 (Fla. 3d DCA 1966); see Marshall-Shaw, 755 So.2d at 165 ("writs of attachment and prejudgment garnishment do not ordinarily lie for unliquidated debts."). Finally, a

7

contingent debt cannot be garnished under Florida law. <u>Cobb v. Walker</u>, 144 Fla. 600, 198 So. 324

(1940)(to be subject to garnishment, debt must be due absolute and without contingency); <u>ITT</u>

<u>Community Development Corp. v. Barton</u>, 569 F.2d 1351, 1361 n.21 (5th Cir. 1978); <u>Tomlin v.</u>

<u>Anderson</u>, 413 So.2d 79 (Fla. 5th DCA 1982).

The requirement that the debt must be liquidated and not contingent is also contained in § 77.031

which requires that the plaintiff seeking a prejudgment writ provide a sworn affidavit specifying: "the

amount of the *debt* and that the *debt* for which plaintiff sues is just, due and unpaid." Fla. Stat. § 77.031

(1999) (emphasis added). <u>See</u> <u>West Florida Grocery Co. v. Teutonia Fire Insurance Co.</u>, 74 Fla. 220, 77

So. 209 (1917); <u>Papadakos</u>, 186 So.2d 786. In <u>Papadakos</u>, the court explained that the word "debt,"

which is also used in the attachment statutes, refers back to the common law forms of actions. <u>See</u>

<u>Papadakos</u> 186 So.2d at 788-89. The court concluded that:

> there may be circumstances where the amount of a claim may be
> technically unliquidated but nevertheless capable of being readily reduced
> to a certainty, and therefore, properly fall within the meaning of the term
> 'debt'. **However, <u>the amount of a reasonable</u> attorney's <u>fee</u> is entirely
> conjectural and <u>is clearly uncertain until</u> either <u>a judge</u> or jury <u>by an</u>
> <u>exercise of judgment</u> makes a determination.**

<u>Id.</u> at 789 (emphasis added).    Here, UBS' alleged claims against Benet seek recovery of unliquidated

damages. Therefore, the claims cannot support the Prejudgment Writs.

The Florida courts have recognized an exception to the rule that tort claims will not support a

prejudgment writ of garnishment in cases where the plaintiff actually seeks to recover an identifiable sum

of moneys that were, in effect, stolen by the defendant. <u>See</u> <u>Barbouti v. Lysandrou</u>, 559 So.2d 648, 650

(Fla. 3d DCA 1990) ("an improper taking of goods or money which actually belongs to another and which

may in itself constitute a tort, also gives rise to an implied contractual obligation to return that property"

and, therefore, can support a prejudgment garnishment); <u>Marshall-Shaw</u>, 755 So.2d at 165 (tort claims

8

can support prejudgment garnishment "if the amounts claimed are ascertainable by simple computation or reference to market price."); Garel & Jacobs, P.A. v. Wick, 683 So.2d 184 (Fla. 3d DCA 1996)(holding that general rule that prejudgment garnishment may not be employed in a tort action did not necessarily preclude garnishment in an action based on a law firm's alleged negligence in allowing a law firm employee who was a father to withdraw his son's guardianship funds from a restricted account held by the law firm, since the action stated a cause of action for funds taken).  UBS will presumably argue that it fits into this exception as its complaint purports to allege a claim for conversion.  That claim, however, could never succeed in light of the actual dealings between UBS, Acero and Benet.  Further, even if that claim could ever have existed, it is time-barred.  Finally, UBS' claims for equitable subrogation, unjust enrichment and for contribution under Swiss law (Swiss Article 51) in addition to having no factual basis, seek unliquidated and contingent damages.  Therefore, UBS' claims do not come within the exception and cannot support the Prejudgment Writs.

**IV.     UBS' Claims Do Not Support the Prejudgment Writs**

UBS' complaint contains four claims that it presumably will attempt to rely upon in order to meet its burden of establishing both that there is a non-contingent, liquidated "debt"due to it that will support the issuance of the Prejudgment Writs and that there is a reasonable probability that it will prevail on the merits.  UBS, however, cannot meet any part of the burden imposed upon it.

**A.     The Swiss Article 51 Claim Does Not Support the Prejudgment Writs**

**1.     Article 51 Requires that the Court Consider UBS' Fault**

UBS' first claim purports to be under Article 51 of the Swiss Code of Obligations.  Even if it is appropriate to apply Swiss law in this case, UBS is wrong in its interpretation of the law.  Article 51 provides that:

> If several persons are liable to the damaged person for the same damage
> based on different legal grounds, whether due to tort (Art. 41) or contract
> (e.g. Art. 111), or as the result of a legal requirement (Arts. 55-58), **then
> the provision regarding recourse among persons who have jointly
> caused a damage <u>(Art. 50) shall be applied accordingly.</u>**
> In this context, as a rule, the damage shall primarily be compensated by
> the person who caused it through an unlawful act (Art. 41), and in the last
> instance by the person who, without personal fault and without a
> contractual obligation, is liable based upon a legal requirement

Article 51 (parentheticals in original, emphasis added). The underlined language from Article 51 expressly

calls for courts to apply Article 50. It is not surprising, however, that UBS' complaint fails to discuss the

governing Article 50. Article 50 provides in relevant part that:

> Where several persons have jointly caused damage . . . they shall be
> jointly and severally liable to the damaged party. (Art 143 et seq.). **The
> judge, in his discretion, shall determine whether and to what extent
> they have a right of recourse (Art. 148) against one another.**

Swiss Code of Obligations, Article 50, Swiss-American Chamber of Commerce, Third revised edition,

1995 (parentheticals in original, emphasis added). Therefore, even if Swiss law applies, the Court would

have discretion, indeed, would be required to use discretion, to determine the extent to which UBS should

recover, if at all, from Benet.

    In order to support this claim, UBS has attached a copy of the judgment entered by the Swiss

Federal Court and refers to some of the conclusions in the judgment. The "Swiss Judgment" did conclude

that both UBS and Benet were liable to the Estate of Acero. It is crucial, however, to understand the

claims asserted in the Swiss proceedings. The Estate of Acero argued, and the Swiss court agreed, that

Benet did not have the right to retain the assets in Acero's Swiss account. There is no question but that

Acero intended that Benet should have those very assets. The Swiss court, however, held that the power

of attorney that UBS had caused Acero to sign -- a power of attorney that UBS believed would be

sufficient to effectuate Acero's intent to transfer the assets to Benet -- was ineffective for that purpose.

This leads to the conclusion that either Swiss law would not allow Acero to do what he intended to do, or else UBS chose the wrong way of going about it. Again, it is significant that the Totten trust laws are well established in the United States and, indeed, Benet was able to keep the moneys in the Florida Totten trust accounts without any problems. If Swiss law did not allow Acero to achieve his goal, UBS should have told him so and should have recommended that Acero place the money elsewhere. Alternatively, if Swiss law did allow Acero to do as he intended, then UBS should have prepared the necessary documentation and properly advised Acero. UBS, however, failed to do either. As a result of UBS' failures, when the Estate of Acero sued UBS and Benet, the Swiss court ruled against both UBS and Benet.

Benet respectfully submits that the facts here lead to only one possible conclusion – UBS is not entitled to any recovery from Benet. In any event, UBS certainly cannot carry its burden of establishing that it is likely to prevail on the merits.

### 2. The Claim Under Article 51 is Contingent and for Unliquidated Damages and Will Not Support the Prejudgment Writs

For purposes of this motion, however, the Court need not decide who is likely prevail to decide in favor of Benet. Again, if the claim is available, resolution of UBS' Article 51 claim requires an application of **discretion**. Therefore, the claim is contingent and unliquidated and cannot support issuance of the Prejudgment Writs. See Ake v. Chancey, 152 Fla. 677, 681 13 So.2d 6 (1943)(where contract provided that a reasonable attorney's fee was to be paid by client and attorney used prejudgment garnishment in action to collect fee: "alleged equitable garnishment was void. . . . It cannot apply where the amount claimed is unliquidated, is in dispute, or is uncertain"); Papadakos, 186 So.2d at 789 ( "the amount of a reasonable attorney's fee is entirely conjectural and is clearly uncertain until either a judge or jury by an exercise of judgment makes a determination" therefore, the claim will not support issuance of

a prejudgment writ of attachment). Because any claim available under Article 51 is contingent and for unliquidated damages, Article 51 claim could not serve to meet UBS' burden of establishing that there is a "debt" due to it from Benet so as to support the issuance of the Prejudgment Writs.

### 3.    Swiss Law Does Not Apply to This Case

There is further reason why the Article 51 claim fails. The Court should not apply Swiss law in this case, at all. In this diversity case, choice of law questions are determined by the law of the forum state. See Lafarge Corp. v. Travelers Indemnity Co., 118 F.3d 1511, 1515 (11th Cir. 1997)("In this diversity action, the federal courts must apply the substantive law of the forum state, Florida. This principle extends to the forum state's conflicts of law rules.")(citations omitted); Judge v. American Motors Corp., 908 F.2d 1565, 1567 (11th Cir. 1990) (same). Florida applies the "most significant relationship" test. See Judge, 908 F.2d at 1567; Bishop v. Florida Specialty Paint Co., 389 So.2d 999 (Fla.1980). In order to determine which state: "has the 'most significant relationship' to a particular issue, a court must . . . examine the facts and circumstances presented in each particular case." Judge, 908 F.2d at 1568. Here, that analysis leads to the conclusion that, as between Florida and Swiss law, Florida. law  should apply.

Benet is a U.S. citizen who has lived in Florida for over 30 years. He has never lived in Switzerland and neither did Acero, who was a Spanish citizen and died in Spain. Acero prepared a will, in Spain, that did not mention his U.S. or Swiss assets. After the death of his wife, Acero repeatedly told his friends, and his bankers, that he intended to leave his U.S. and Swiss assets to Benet. In the months after Acero's death, Benet transferred the money that his friend left to him in Switzerland to accounts in his home state of Florida. The Spanish executor of Acero's Spanish estate later sued Benet and UBS in Switzerland and prevailed against both. UBS has now sued Benet in Florida and contends that he should bear the fault for something that would not have occurred if UBS had adequately given effect to Acero's wishes or alternatively had properly advised Acero. Thus, UBS' complaint invokes "loss distribution"

12

rules rather than "conduct regulation rules." See Judge, 908 F.2d at 1572 n.9 (describing different policies of these rules). Where a conflicts dispute implicates a state's loss distribution rules, "a state's interest is triggered not by the location of the injury/conduct but, rather, by the fact that the action joins the state's residents." Id. Additionally, in connection with its complaint, UBS has caused this Court to issue the Prejudgment Writs, invoking the extraordinary remedies available under the Florida garnishment statutes. The relevant factors weigh in favor of applying Florida law.

Finally, as the Eleventh Circuit made clear in the Judge case, equitable considerations also play a significant, and in appropriate cases, dominant role in conflicts of law decisions. Id. at 1574-75. Here, as discussed below, application of Florida law in the form of an equitable conversion claim would require the Court to weigh the equities and make a decision to apportion fault on the basis of all relevant facts. To the extent that UBS is correct in its contention that Swiss Article 51 would require a determination in its favor on the basis of a prior court's technical classification of the parties respective conduct, as contained in the Swiss Judgment, application of Swiss law would lead to an inequitable result. In Judge, the court refused to apply Mexican law in part because: "If the law of either Florida or Michigan is applied, the appellant will be permitted to seek some type of remedy for the death of his wife. If, however, Mexican law is applied, the appellant's claim will be completely foreclosed in both this country and Mexico." Id. See id. at 1574 (discussing In re Air Crash Disaster Near New Orleans, 789 F.2d 1092 (5th Cir. 1986), where, in choosing between law of Louisiana and law of Uruguay: "the court observed that because Louisiana did not recognize a cause of action for a nephew's wrongful death claim, the application of Louisiana law would foreclose Pampin's claim entirely. The court obviously deemed it more important to avoid this harsh result than to foster predictability: the court therefore held flatly that Uruguayan law would control Pampin's claim for the death of his aunt.")(citation omitted). UBS' claim should be resolved by the law of Florida, not by Swiss law.

13

### 4.    The Swiss Judgment Does Not Have Preclusive Effect

UBS purports to rely on findings contained in the Swiss Judgment in order to support its Article 51 claim.  The Swiss Judgment, however, is not entitled to "full faith and credit" and is not otherwise entitled to be given any weight in the instant case which seeks to test the relative liability of UBS and Benet.  Significantly, UBS did not assert any claims against Benet in the Swiss proceedings and there was no occasion for Benet and UBS to dispute the issue of fault or liability, as between UBS and Benet, in the Swiss proceedings.  The Swiss court, therefore, did not adjudicate any such claims and did not decide any issues relevant to the claims now asserted by UBS against Benet.  Moreover, Benet had no incentive to litigate the question of the relative fault of UBS and Benet in the Swiss proceedings.  Therefore, any findings that may be contained in the Swiss Judgment do not carry preclusive effect in this case.

To the extent that UBS purports to rely on findings contained in the Swiss Judgment, it is in fact asking this Court to give the Swiss Judgment collateral estoppel or preclusive effect.  UBS' request is contrary to law:

> Preclusive effect will be given to the adjudication of an issue litigated in a prior proceeding **if the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue was necessary in the prior action.**

Williams v. Bennett, 689 F.2d 1370 (11th Cir. 1982) (emphasis added, citations omitted); see McWhorter v. Dixie Nat'l Life Ins. Co., 887 F.2d 1564, 1567 (11th Cir. 1989)("Collateral estoppel is appropriate **only when the identical issue has been fully litigated in a prior case.**")(emphasis added, quoting Rufenacht v. Iowa Beer Processors, 656 F.2d 198 (5th Cir. 1981)).  As previously discussed, the issue of the relative fault or liability as between Benet and UBS was not even discussed in the Swiss proceedings.  The issue was not litigated, at all.  Therefore, the Swiss Judgment could not be given preclusive effect in this case where UBS Asserts that, as between it and Benet, Benet has the greater fault.

14

Again, although UBS and Benet were both parties to the Swiss proceedings, both were defendants and UBS did not assert a claim as plaintiff or cross-plaintiff against Benet. What UBS is in fact requesting, therefore, is that the Court allow it to use "offensive" collateral estoppel. See Rufenacht, 656 F.2d at 202 ("offensive collateral estoppel" occurs when "a plaintiff seeks to estop a defendant from relitigating issues which a defendant previously litigated and lost **against another plaintiff**")(emphasis added). There are, therefore, even more reasons why the Court should not give any preclusive effect to the Swiss Judgment:

> "The offensive use of collateral estoppel raises particular judicial concerns; it is governed by slightly different principles than the historic defensive use of the issue preclusion claim." The Supreme Court has cautioned that fairness to both parties is of primary consideration. **Special difficulties arise when precluding a party who did not have the initiative in the prior action.** Finally, the trial court has broad discretion when determining whether offensive collateral estoppel is appropriate.

Provau v. State Farm Mutual Automobile Ins. Co., 772 F.2d 817, 821-22 (11th Cir. 1985)(emphasis added, citation omitted, quoting Cotton States Mutual Insurance Co v. Anderson, 749 F.2d 663, 666 (11th Cir. 1984)). Because the issues raised by UBS' claims against Benet are completely different than the issues raised in the Swiss proceeding where the Acero Estate asserted claims against both UBS and Benet, there is simply no basis for giving the Swiss Judgment preclusive effect in this case.

### 5.    The Court Must Consider Benet's Defenses and Claim for Set-off

Finally, as regards the Swiss law claim, even if the findings in the Swiss Judgment could be given preclusive effect and even if Swiss law applies, and even if, contrary to the plain language of Article 51, the Court would not have discretion to "determine whether and to what extent" UBS and Benet "have a right of recourse . . . against one another," UBS would still not be entitled to issuance of the Prejudgment Writs. Even if UBS' interpretation of Swiss law was correct, Benet nevertheless has a right to a complete set-off as a result UBS' wrongdoing.   In determining whether a prejudgment writ of

garnishment will lie, a court is not limited to reviewing the sufficiency of the plaintiff's complaint. The court must also consider the defendant's defenses. See Matthews v. Wood, 485 So.2d 472 (Fla. 2d DCA 1986). No matter how much UBS would like to avoid it, the propriety of the Prejudgment Writs must be determined in light of all of the facts. For this further reason, UBS' Article 51 claim cannot justify issuance of the Prejudgment Writs.

### B. The Money Had and Received / Unjust Enrichment and Equitable Subrogation Claims Cannot Support the Prejudgment Writs

UBS has also asserted a claim for "Money Had and Received / Unjust Enrichment" and a separate claim for equitable subrogation. Both claims require the Court to consider all relevant facts in order to reach an equitable result. In light of the facts that lead to the Swiss Judgment having been entered against both Benet and UBS, UBS cannot prevail on any of these claims. Further, these claims are all contingent and seek unliquidated damages. Therefore, none of these claims will support the issuance of the Prejudgment Writs.

Although UBS purports to state a claim for money had and received / unjust enrichment, there is, in fact, no basis for such a claim even under the facts pled by UBS. There is no dispute that both UBS and Benet were held liable to the Estate of Acero in the Swiss Judgment. UBS, as a judgment debtor, then proceeded to pay the judgment. If UBS had any claim against Benet under the circumstances it would be for equitable subrogation or the Swiss equivalent, Article 51. On these facts, there is no basis for asserting a claim for money had and received, or unjust enrichment. Instead,

> An action for money had and received, or the more modern action for unjust enrichment, is an equitable remedy **requiring proof that money had been paid due to fraud, misrepresentation, imposition, duress, undue influence, mistake, or as a result of some other grounds appropriate for intervention by a court of equity. <u>The mere fact that an overpayment of some sort has been demanded and payment made will not support the action.</u>**

Hall v. Humana Hospital Daytona Beach, 686 So.2d 653, 656 (Fla. 5th DCA 1996)(emphasis added, citations omitted). Even if UBS had somehow paid more than its share of the Swiss Judgment, this would not give rise to an action for either money had and received, or unjust enrichment.

Further, a claim for money had and received, or unjust enrichment requires that a court equitably consider all relevant facts. See Equilease Corp. v. Hentz, 634 F.2d 850, 853 (5th Cir. 1981)("Under Florida law, a plaintiff may recover money paid by mistake of fact to a defendant if, in equity and good conscience, the defendant should not be allowed to keep the money.   The form of such a cause of action is alternatively referred to as one for restitution, unjust enrichment, quasi-contract, or an action for money had and received.   By whatever name, the theory of recovery is a creature of equity and governed by principles of equity.   Consequently, restitution may be denied where circumstances make it unfair or unjust to require the payee or recipient to repay the money or benefit conferred.")(citations omitted); Sharp v. Bowling, 511 So.2d 363, 364-65 (Fla. 5th DCA 1987)("'money had and received' constitutes a remedy at law to recover money erroneously paid or received by a defendant when to permit the defendant to keep the money would unjustly deprive the plaintiff of his ownership of the money.   Though this remedy is an action at law, **it is equitable in nature and is founded upon the equitable principle that no one ought to be unjustly enriched at the expense of another**.")(emphasis added, citations omitted); Republic of Haiti v. Crown Charters, Inc., 667 F.Supp. 839, 846 (S.D. Fla. 1987)("An action for money had and received may be brought where the defendant holds money which in equity and good conscience he should pay over to the plaintiff").

The cited authorities establish that a claim for money had and received, or unjust enrichment, if it was available, would require UBS to make a showing that, among other things, under the circumstances, it would be inequitable for Benet to retain any "benefit" that UBS conferred upon him. As discussed above, UBS can not make that showing here.   Therefore, UBS cannot meet its burden of establishing that it is

likely to prevail on its claim for money had or unjust enrichment.  Further, again, even if such a claim was

available to UBS, it is a contingent claim for unliquidated damages.  Therefore, it could not serve to meet

UBS' burden of establishing that there is a "debt" due to UBS from Benet.  Accordingly, this claim will

not support the issuance of the Prejudgment Writs.

     The same holds true for UBS' purported reliance on its equitable subrogation claim as a basis for

supporting the Prejudgment Writs.   Under Florida law:

> [E]quitable subrogation arises when the person discharging the obligation
> is under a legal duty to do so or when the person discharges the obligation
> to protect an interest in, or a right to, the property.     The Florida
> Supreme Court recently explained that equitable subrogation is generally
> appropriate where:  (1) the subrogee made the payment to protect his or
> her own interest, (2) the subrogee did not act as a volunteer, (3) the
> subrogee was not primarily liable for the debt,(4) the subrogee paid off the
> entire debt, and (5) subrogation would not work any injustice to the rights
> of a third party.   See Dade County School Board v. Radio Station
> WQBA, 731 So.2d 638 (Fla.1999).   **The right to subrogation is not
> absolute, but depends upon the equities and attending facts of each
> case.   The right to recover from a third person is conditional on
> whether or not the right of the one seeking subrogation is superior
> to the equities of those against whom the right is sought to be
> enforced.**

National Union Fire Ins. Co. v. KPMG Peat Marwick, 742 So.2d 328 (Fla. 3d DCA 1999), approved,

2000 WL 986007 (Fla. July 13, 2000)(emphasis added, some citations omitted).  The discussion in KPMG

makes clear that, unlike the claim for money had and received or unjust enrichment, an equitable

subrogation claim may be available in a circumstance where a party has paid more than its share of a

judgment debt. At the same time, however, KPMG vividly illustrates why UBS could not succeed on this

claim. The claim is equitable and requires consideration of the underlying facts.  Here, again, the fact that

UBS was entirely to blame for Benet's troubles, means that it cannot prevail on the claim.[2]  Certainly, UBS

---

[2]    Again, the equities are overwhelmingly and only in Benet's favor.  UBS merely
had to provide Acero with the proper legal method of accomplishing his stated intent of leaving

cannot meet its burden of proving a likelihood of prevailing on the merits. Finally, the claim is contingent and seeks unliquidated damages. Therefore, even if UBS could somehow prevail on the merits, the claim nevertheless cannot support the issuance of the Prejudgment Writs.

**C.     UBS Cannot Sustain a Claim for Conversion Against Benet; In Any Event, the Claim Is Time-Barred and Cannot Support the Prejudgment Writs**

UBS' last claim is for conversion. Like its attempt to assert a claim for money had and received, or unjust enrichment, the conversion claim simply does not fit the facts. Again, the only claim that UBS could legitimately attempt to assert is one for equitable subrogation. Indeed, a threshold requirement for asserting a claim for conversion is that the plaintiff have a possessory right in the asset that is allegedly converted. See Shafi v. State, 377 So.2d 787, 789 (Fla. 1st DCA 1979)("A possessory interest . . . is the key to the right to bring an action for the conversion of one's goods.") It is undisputed, however, that the assets allegedly converted belonged either to Benet or to the Estate of Acero, but certainly not to UBS. Indeed, UBS filed this lawsuit in an effort to recover the amounts paid in connection with the Swiss Judgment entered in favor of the Estate of Acero. Because UBS did not own or have a right to possess the assets it now contends were "converted," UBS has no right to assert a claim for conversion against Benet.

In any event, if such a claim existed, it has long-since been barred by limitations. UBS alleges that between "July 5 and September 22, 1989, Benet transferred all of the funds which he received from the UBS account" to his own accounts. Complaint, ¶ 15. Further, UBS alleges that it "has been wrongfully deprived of the funds in the UBS account that it paid to Benet pursuant to the power of attorney that Benet

---

the moneys to Benet. Alternatively, UBS should have advised Acero to place his monies elsewhere. Either would have accomplished Acero's intent and would have prevented any troubles for UBS or Benet – as in fact the Florida Totten trust accounts did. Instead, UBS simply kept the monies in the bank and assured Acero that the power of attorney it caused him to sign would achieve his intent.

19

presented to UBS." Complaint, ¶ 42. In other words, UBS contends that Benet "converted" the assets in question 11 years ago. As discussed below, a claim for conversion is governed by a four year statute of limitations. Because the claim has been asserted long after the applicable limitations period has passed, if the claim ever existed, it is time-barred.

The statute of limitations applicable to a claim for conversion is four years. Behar v. Sunbank/Miami, N.A., 591 So.2d 969, 970 (Fla. 3d DCA 1991)("conversion . . . claims were time barred . . . by the applicable four-year statute of limitations"); see Fla. Stat. 95.11(3)(p)(2000)("Actions other than for recovery of real property shall be commenced as follows: . . . (3) WITHIN FOUR YEARS . . . (p) Any action not specifically provided for in these statutes."). Further, the statute of limitations begins to run on a claim from the date the cause of action accrues. Hawkins v. Barnes, 661 So.2d 1271, 1272 (Fla. 5th DCA 1995) (citing Kush v. Lloyd, 616 So.2d 415 (Fla.1992); Penthouse North Ass'n, v. Lombardi, 461 So.2d 1350 (Fla.1984)). Finally, "[a] cause of action accrues when the last element constituting the cause of action occurs." Fla. Stat. 95.031(1)(2000).

An action for conversion based upon removal of monies from a bank account is deemed to accrue when the defendant obtains possession of the monies. Allen v. Gordon, 429 So.2d 369, 371 (Fla. 1st DCA 1983) (conversion by stepson's withdrawal of money from accounts held jointly with stepfather without stepfather's knowledge or consent, took place when the money was removed from accounts); Eagle v. Benefield-Chappell, Inc., 476 So.2d 716 (Fla. 4th DCA 1985) (conversion by transferring funds in bank account of defendant's client after termination of contractual relationship, "took place when the money was disbursed without [the client's] authorization").

Here, again, by its own account, UBS's conversion claim is based on its contention that, between July and September, 1989, Benet converted assets to his own use. Complaint, ¶¶ 15 and 42. These allegations demonstrate that UBS' alleged conversion claim accrued in 1989. In other words, by its own allegations, UBS' conversion claim accrued eleven years ago, well over ten years before the complaint was

20

filed.  If such a claim ever existed, it is time barred .  Therefore, UBS is not entitled to any recovery from Benet under its conversion claim.  Certainly, as with the rest of its claims, UBS cannot carry its burden of establishing that it is likely to prevail on the merits.

### V.     UBS Must Establish That it Conducted a Sufficient Investigation As a Prerequisite to Moving for Issuance of the Prejudgment Writs

As previously discussed, under the governing Florida law, the Prejudgment Writs must be dissolved unless UBS carries its burden of proving the grounds for the issuance of the Prejudgment Writs. Fla. Stat. § 77.07(2); see Doug Sears Consulting, 752 So.2d 668, 669-70; Marshall-Shaw v. Ford, 755 So.2d 162, 164.  One requirement of a motion for issuance of a prejudgment garnishment is that the plaintiff must express a belief that the defendant: "will not have in his possession, after execution is issued, tangible or intangible property in [Florida] and in the county in which the action is pending on which a levy can be made sufficient to satisfy the plaintiff's claim." Fla. Stat. § 77.031(2).  UBS' motion for issuance of the Prejudgment Writs, which baldly asserts compliance with the statutory requirement, will not satisfy its burden.  UBS must demonstrate that it conducted an investigation sufficient to support its asserted belief. See Bertman v. Kurtell & Co., 205 So.2d 685 (Fla. 3d DCA 1967).  The failure to have conducted such an investigation before filing a motion for issuance of a prejudgment garnishment is sufficient is grounds for dissolution of the writ.  Id. (affirming order dissolving prejudgment garnishment where trial court found that plaintiff made no effort to investigate whether the defendant had sufficient assets).  UBS must prove that it made the requisite investigation here.  If UBS failed to do so, this is an independent and sufficient basis for dissolving the Prejudgment Writs.

## Conclusion

For the foregoing reasons and based upon the cited authorities, the Court should dissolve the Prejudgment Writs of Garnishment obtained by UBS and should award Benet his damages including attorneys fee.

Respectfully submitted,

RODRIGUEZ & ANGELO, P.A.

Frank R. Rodriguez
Florida Bar No.: 348988
Paulino A. Núñez Jr.
Florida Bar No.: 814806
Attorneys for Defendant, Benet
600 Banco Santander Center
1401 Brickell Avenue
Miami, Florida 33131
Telephone:      305-350-2300
Facsimile:      305-350-2525

## Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing Defendant Benet's Memorandum in Support of His Motion to Dissolve Prejudgment Writs of Garnishment and For Attorney's Fees was sent via Hand Delivery on this 28 day of September, 2000 to: Maxine M. Long, Shutts & Bowen, LLP, 1500 Miami Center, 201 So. Biscayne Boulevard, Miami, Florida 33131.

